IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 03-cv-02589-MSK-OES

THE ESTATE OF LYLE EUGENE LARSEN by and through FLORENCE STURDIVAN, personal representative,

    Plaintiff,

v.

RANDY MURR,
GERALD WHITMAN, Chief of Police of the City and County of Denver and
CITY AND COUNTY OF DENVER,

    Defendants.

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (#34) AND DIRECTING THE CLERK OF COURT TO CLOSE THIS CASE**

THIS MATTER comes before the Court on the Defendants' Motion for Summary Judgment **(#34)**. Having considered the motion, the response **(#41),** the reply **(#44)**, and the attachments thereto, the Court finds and concludes as follows.

### I. Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### II. Issues Presented

The Court must determine whether Defendant Murr ("Officer Murr") is entitled to qualified immunity on the Plaintiff's ("the Estate") excessive force claim. The Court must then determine whether a trial is required on the Estate's remaining claims against the City and County of Denver and Chief Whitman.

### III.  Material Facts

This case arises from the tragic confrontation between a suicidal man and the police. Based upon the evidence submitted, which the Court construes most favorably to the Estate, the Court finds for purposes of this motion that:

1. Shortly after midnight on April 15, 2003, Lyle Larsen placed a 911 telephone call. During such call, he stated that he was going to kill someone or himself.

2. Officers Murr and Brase were dispatched to Mr. Larsen's residence.

3. After the officers arrived, they encountered Mr. Larsen in front of the residence.

4. Mr. Larsen was located on a landing at the base of the residence's porch.  The landing was 6 steps above the sidewalk where the officers were standing.  Next to the landing was a small yard elevated above the sidewalk.  A retaining wall separated the yard from the sidewalk.

5. Mr. Larsen was holding a large knife which was more than 1 foot long.

6. Both officers ordered Mr. Larsen to drop the knife.  He bent his knees and touched the tip of the knife to the ground, but then stood back up with the knife in his hand.  He raised the knife above his shoulder, turned towards Officer Murr, pointed the knife at Officer Murr, then took a step toward Officer Murr.  At that time, Mr. Larsen's eyes "got big the size of quarters."

7. Officer Murr testified at his deposition that he thought he was going to die and was in fear for his life.

8. At that point, Officer Murr said, "Drop the knife or I'll shoot."  He then shot Mr. Larsen twice.  Mr. Larsen died from his wounds.

9. When Officer Murr shot Mr. Larsen, they were several feet apart.  The exact distance is unknown.  Officer Murr believed they were 7 to 12 feet apart.  However, they might

have been as far apart as 15 to 20 feet.

      10.    At the time of the shooting, Officer Murr knew about the "21-foot rule." This is a "reaction time" calculation which concludes that a suspect carrying an edged weapon can be life threatening within 21 feet. It is based upon an assumption that a suspect carrying a knife can move 7 paces in approximately 1.5 seconds.

      11.    To gain a subject's compliance, officers are taught to use the least amount of force necessary and to match the force that confronts them.

      12.    Between 2000 and 2003, a police department committee considered arming police officers with "less-lethal" weapons.

      13.    The "Taser" gun, which shoots wires with an electrical charge, was deployed to officers in April 2003. The less-lethal shotgun, which shoots beanbags, was deployed at the end of 2003. The pepper ball, which shoots tear gas, was also deployed in 2003.

### IV.  Standard of Review

Determination of claims or defenses on their merits without a trial is governed by Rule 56 of the Federal Rules of Civil Procedure, which facilitates the entry of a judgment if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Rule 56 authorizes summary adjudication when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©. Substantive law determines the material facts and issues. It specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's*

*Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence for a reasonable jury to find in favor of the non-movant on the claim or defense that the non-movant is obligated to prove. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**V. Analysis**

**A.  Claim 1**

Claim 1 is an excessive force claim.[1]  The Estate alleges that Officer Murr used excessive force against Mr. Larsen, resulting in Mr. Larsen's death.  Officer Murr contends, and the Estate disputes, that he is entitled to qualified immunity.

Qualified immunity is a protection from trial and other burdens of litigation.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005).  When facing a claim for civil damages under 42 U.S.C. § 1983, a police officer is entitled to qualified immunity if his conduct did not violate a clearly established statutory or constitutional right of which a reasonable officer would have known.  *See Wilson v. Layne,* 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1247 (10th Cir. 2003).  The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *See Roska*, 328 F.3d at 1251 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  No matter how tragic the consequences of an officer's conduct, qualified immunity must be recognized if reasonable officers

---

[1] Although Claim 1 purportedly asserts violation of substantive and procedural due process rights and a claim against the City and County of Denver, it must be treated as an excessive force claim against Officer Murr, only.

The Supreme Court has instructed in *Graham v. Connor,* 490 U.S. 386, 395 (1989), that the Fourth Amendment guides the analysis of an excessive force claim.  The Tenth Circuit has elaborated on this principle, stating that a substantive due process claim based upon the use of excessive force cannot be asserted unless there is no seizure within the meaning of the Fourth Amendment.  *See Bella v. Chamberlain*, 24 F.3d 1251, 1257 (10th Cir. 1994).  In other words, a substantive due process claim is available only when a Fourth Amendment claim is not.  Therefore, the Court treats Claim 1 solely as a Fourth Amendment excessive force claim.

This claim also is asserted against both Officer Murr and the City and County of Denver ("the City").  However, no excessive force claim can be asserted directly against the City.  The only claim that the Estate can assert against the City would be pursuant to *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690-91 (1978), which it has done in Claims 2 and 3.  Therefore, the Court treats Claim 1 as asserted only against Officer Murr.

could disagree as to the appropriateness of the course of action taken. *See id.*

In response to Officer Murr's claim of qualified immunity, the Estate bears the heavy burden of producing evidence that establishes that: (1) Officer Murr violated a constitutional or statutory right; and (2) the right was clearly established at the time of Officer Murr's unlawful conduct. *See Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004).

Under this two-pronged test, the Court first determines whether a constitutional right was violated. This inquiry requires the Court to evaluate all facts in the light most favorable to the Estate. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the Estate meets its burden under the first prong, then the Court determines whether the constitutional right was clearly established. *See id.* This inquiry is made in light of the specific context of the case, not as a broad general proposition. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*). However, the particular officer's subjective understanding of the law is not pertinent to this analysis. Whether the law was clearly established is essentially a legal question and is measured by an objective standard. *See Crawford-El v. Britton,* 523 U.S. 574, 589-90 (1998). Although the Estate is not required to identify a factually identical case to demonstrate that the constitutional right was clearly established, however, it should identify a Supreme Court or Tenth Circuit opinion on point, or demonstrate that the right is supported by the weight of authority from other courts. *See Robbins v. Wilkie*, 433 F.3d 755, 764 (10th Cir. 2006). With these standards in mind, the Court turns to the specific claim asserted against Officer Murr.

The use of excessive force violates the Fourth Amendment. *See id.* at 198-99. Whether the use of force was excessive in a particular case requires the Court to consider the totality of the circumstances to determine whether the force used was objectively unreasonable. *See Jiron v.*

*City of Lakewood*, 392 F.3d 410, 414-15 (10th Cir. 2004). In this analysis, several non-exclusive factors are considered – the severity of the crime at issue, whether the suspect posed an immediate risk of harm to an officer or another person, whether the suspect was evading arrest, and whether the officer's own conduct created the need to use any force. *See id.* The reasonableness of an officer's actions is evaluated "from the on-scene perspective, not with the advantage of 20/20 hindsight." *See id.* at 418; *see also Saucier*, 533 U.S. at 205.

    Here, the burden is on the Estate to produce evidence that shows that the use of lethal force against Mr. Larsen was objectively unreasonable. It has not done so; indeed, the evidence produced shows just the contrary. The encounter occurred in the middle of the night. After receiving repeated orders to drop his knife, Mr. Larsen refused. He then held the knife in a threatening manner toward Officer Murr and took one step toward Officer Murr. Based upon Mr. Larsen's conduct and facial expression, Officer Murr believed that his life was in jeopardy. The Estate has presented no evidence that Officer Murr's perception or belief was unreasonable.

    The Estate contends that Officer Murr contributed to the deadly confrontation because he did not wait for and failed to request backup assistance, failed to retreat or take a defensive position behind a truck or light pole, failed to "talk Mr. Larsen down," placed himself too close to Mr. Larsen, failed to use other means to disarm Mr. Larsen (*i.e.*, with his baton), failed to request for a member of the SWAT team to use less-lethal weaponry, failed to request other assistance from officers trained in crisis techniques, and failed to call for a less lethal weapon to be provided for his own use. In support of such contention, the Estate proffers the opinion of its expert, H. Ellis Armistead, that Officer Murr had other options available other than use of deadly force. This may be true, but for purposes of this analysis, the Court does not determine whether Officer

Murr's response was the best or most desirable response under the circumstances, only whether Officer Murr's belief and response was a reasonable one. Thus, the question is not whether Officer Murr could have used less-lethal alternatives, but whether it was reasonable for him to use lethal force under these circumstances. *See Jiron*, 392 F.3d at 418; *see also Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001). To evaluate other possible responses Officer Murr might have taken, would cause the Court to engage in the "Monday-morning quarterbacking" prohibited by *Jiron* and *Medina*.

The Tenth Circuit's treatment of this type of argument in *Jiron* is instructive. Jessica Jiron argued that the officer recklessly and deliberately created the need to use deadly[2] force by cornering her in a back bedroom of a second-story apartment. Upon belief that Ms. Jiron had committed a crime, the officer pursued her into the apartment. Ms. Jiron grabbed a knife, ran into the back bedroom, closed the door, and threatened to kill herself. The officer called for backup assistance and planned to wait for such assistance before taking further action, but Ms. Jiron tried to escape from a bedroom window. The officer repeatedly ordered Ms. Jiron to drop the weapon and to exit the bedroom, but she refused. The officer also repeatedly attempted to enter the bedroom. Ms. Jiron finally exited the bedroom and put her knife beneath her chin. She then advanced upon the officer and refused orders to drop her weapon. When Ms. Jiron was within 5 feet of the officer, she raised her knife toward the officer and began hacking it in the air. At that time, the officer shot Ms. Jiron in the abdomen. The Tenth Circuit declined to consider whether a more peaceful resolution would have been attained if the officer had waited for the arrival of backup assistance. It instead concluded that Ms. Jiron had not alleged sufficient facts to support a

---

[2] The force used in *Jiron* was "deadly force" even though it did not result in Ms. Jiron's death.

conclusion that the officer acted unreasonably under the circumstances.[3]

The conclusion is the same here. The Estate has not come forward with sufficient evidence to establish that Officer Murr's use of lethal force against Mr. Larsen was objectively unreasonable under the circumstances.

This ordinarily would end the qualified immunity analysis. However, even if the Estate had produced sufficient evidence to establish that Officer Murr's use of lethal force was objectively unreasonable, it has not satisfied the second prong in the qualified immunity analysis.

Under the second prong of the qualified immunity analysis, the Estate bears the burden of establishing that a reasonable officer would have known that using lethal force under these circumstances would be unlawful. *See Brosseau*, 543 U.S. at 199-200. This requires that the Estate demonstrate some rule, regulation or case-law that instructed reasonable officers not to use lethal force in these circumstances. The Estate points to no such authority. Quite to the contrary, the *Jiron* case in this circuit suggests that the use of lethal force in this type of circumstances is lawful.

Without production of case-law or other legal authority, the Court cannot conclude that a reasonable officer would have known that the use of lethal force in these circumstances was

---

[3] In *Jiron*, the Tenth Circuit reflected upon *Sevier v. City of Lawrence, Kansas,* 60 F.3d 695 (10th Cir. 1995), the facts of which are more similar to this case. As in this case, *Sevier* involved a suicidal individual who was killed after refusing to comply with officers' orders to drop his knife. However, contrary to this case, there were witnesses to the confrontation other than the officers. The witnesses and the officers had conflicting testimony as to what occurred. This gave rise to a genuine factual dispute as to whether an officer could reasonably fear for his life and whether the officers' conduct precipitated the use of deadly force. On appeal of a denial of qualified immunity, the Tenth Circuit concluded that it lacked jurisdiction over the appeal. Due to factual and procedural distinctions, *Sevier* does not guide this Court's determination.

excessive. Because the Estate has not carried its burden with regard to either prong of the analysis, Officer Murr is entitled to qualified immunity.

**B. Claim 2**

In Claim 2, the Estate alleges that the City implemented, or failed to implement, policies which resulted in Mr. Larsen's death. The City contends that the Estate cannot establish the requisites for municipal liability. The Estate contends otherwise.

There can be no municipal liability without a predicate constitutional violation by an individual officer. *See Trigalet v. City of Tulsa, Oklahoma*, 239 F.3d 1150, 1154 (10th Cir. 2001). As discussed *supra*, the Estate has not come forward with sufficient evidence to establish a constitutional violation by Officer Murr. Therefore, the Estate cannot prevail on a claim against the City.

However, even in the absence of this defect, there is insufficient evidence to establish a *prima facie* claim. To make a *prima facie* showing of municipal liability, the Estate must produce evidence of: (1) the existence of a municipal custom or policy to engage (or not engage) in certain conduct and (2) a direct causal link between execution of the custom or policy and a constitutional injury. *See Jenkins v. Wood,* 81 F.3d 988, 993 (10th Cir. 1996); *see also Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690-91 (1978).

The Estate has produced evidence of a single policy known as the "21-foot rule". This so-called "rule" is, in essence a formula for calculating how long it would take for a person carrying an edged weapon to inflict lethal harm to a nearby person. According to this formula, a person with an edged weapon standing within 21 feet of another can inflict lethal harm within approximately 2 seconds. The 21-foot rule is not a policy that directed or compelled Officer

Murr's behavior. It is, instead, a formula used to aide an officer's assessment of risk.

The Estate also contends that, at the time of Mr. Larsen's death, the City engaged in a custom of not arming officers with "less-lethal" weapons. In 2000, the City assembled a committee to address whether to provide "less-lethal" weapons to patrol officers, but the committee had not finished its work by the time of Mr. Larsen's death. "Less-lethal" weapons such as Tasers, the "less-lethal" shotgun, and the pepper ball were available at the time of Mr. Larsen's death but had not been provided to patrol officers. It was not until April 2003 that the City began deploying Tasers to patrol officers. It did not deploy the less-lethal shotgun or pepper ball to patrol officers until later that year.

It is unclear that the City engaged in a deliberate decision not to deploy "less-lethal" weapons between 2000 and 2003. However, assuming it did and that such behavior amounts to a "custom or policy", there is no evidence in the record that Officer Murr would have acted any differently had he been equipped with a "less lethal" weapon. He testified that he believed that Mr. Larsen was going to kill him. The Court cannot speculate that if Officer Murr had been issued a "less-lethal" weapon, he would have chose to use it in these circumstances. Thus, the Court cannot conclude that the failure to issue "less-lethal" weapons caused Mr. Larsen's death

**C. Claim 3**

In Claim 3, the Estate alleges that the City and Chief Whitman failed to train police officers (including Officer Murr) against the use of excessive force. Claim 3 is actually comprised of two separate claims, each governed by different standards – a claim against the City as a governmental body, and a claim against Chief Whitman in his role of supervisor. The City and Chief Whitman argue that the Estate cannot make a predicate showing of liability on either claim,

and the Estate argues otherwise.

Neither claim can proceed without a predicate constitutional violation. *See Trigalet v. City of Tulsa, Oklahoma*, 239 F.3d 1150, 1154 (10th Cir. 2001). As discussed *supra*, because the Estate has not met its burden of producing sufficient evidence to establish a constitutional violation, there can be no *prima facie* claim against the City or Chief Whitman.

However, even if the Estate had met its burden, the Estate has not produced sufficient evidence of other elements necessary for a *prima facie* claim. To make a *prima facie* showing of municipal liability for failure to train, the Estate must produce evidence that: (1) the training that officers received was inadequate; (2) Officer Murr exceeded constitutional limitations on the use of force; (3) the use of force arose under circumstances that constitute a usual and recurring situation; (4) the inadequate training demonstrates a deliberate indifference on the part of the City toward persons with whom the police officers come into contact, and (5) there is a direct causal link between the constitutional deprivation and the inadequate training. *See Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000).[4]

The Estate has not produced sufficient evidence to support the first and fifth elements. The Estate argues that the training Officer Murr received was inadequate because he was not taught how to approach the residence of a suicidal suspect, how to take cover when a suspect has a knife, how to assess the level of threat when facing a suspect armed with a knife, how to assess when the 21-foot rule applies, how to disarm a suspect with a knife, or when to request backup assistance from officers possessing less lethal weapons or with experience dealing with suicidal

---

[4] These elements were established in recognition of the Supreme Court's conclusion that a municipality's failure to train officers can constitute a "custom or policy" if the failure to train is the result of deliberate indifference. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989).

Case 1:03-cv-02589-MSK-MEH   Document 51   Filed 02/10/06   USDC Colorado   Page 13 of 14

persons. However, the Estate has proffered no evidence to establish that Officer Murr was not taught these things.[5] In addition, the Estate has offered no evidence that Officer Murr would have acted any differently had he received training which the Estate contends was not provided.

The Complaint does not specify whether the Estate is suing Chief Whitman in his individual or official capacity. Apparently, the Estate is suing Chief Whitman in his policymaker role, but it also requests an award of punitive damages against him, personally. Therefore, the Court treats the claims as asserted against Chief Whitman in both his official and individual capacities. *See Pride v. Does*, 997 F.2d 712, 715 (10th Cir. 1993).

To the extent that he is sued in his official capacity, the analysis with respect to municipal liability governs. *See Myers v. Oklahoma County Bd. of County Com'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) (a suit against a municipal employee in his official capacity is the same as a suit against the municipality).

However, to the extent that he is sued in his individual capacity, another analytical framework governs. Chief Whitman may be individually liable only if there is an affirmative link between his conduct and a constitutional violation. *See Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000); *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988). The Estate has presented no evidence of any specific conduct engaged in by Chief Whitman which can be

---

[5] The Court has carefully considered the exhibits submitted with and referred to in the Estate's response to the motion for summary judgment as to this issue. Many times, however, the exhibits do not state what the response purports. For instance, at his deposition, Officer Murr did not testify that he was not taught how to disarm a suspect carrying a knife, only that he could not remember whether it was part of his training or what he was specifically taught. The response also states that "[o]fficers are taught that 'cover' is limited to something that would stop a bullet." The accompanying pinpoint citations to the record, however, do not support that statement. Instead, the evidence shows that officers are taught about cover from gunfire, not that such teachings are "limited" to cover from gunfire.

correlated with the death of Mr. Larsen.

**IT IS THEREFORE ORDERED** that the motion for summary judgment **(#34)** is **GRANTED**. Summary judgment is entered in favor of the Defendants as to all claims. The Clerk of Court is directed to close this case.

Dated this 10th day of February, 2006

**BY THE COURT:**

_____
Marcia S. Krieger
United States District Judge